## MEIER v JOSEPH R PEEBLES SONS CO

Ohio Appeals, 1st Dist, Hamilton Co

No 5183. Decided April 12, 1937

Frost & Jacobs, Cincinnati, and Cornelius Petzhold, Cincinnati, for appellant.

Froome Morris, Cincinnati, and A. A. Rendigs, Cincinnati, for appellee.

## OPINION

By ROSS, PJ.

Appeal on questions of law from the Court of Common Pleas of Hamilton County.

The appellant brought suit against the appellee for the recovery of compensation for the death of his decedent, who was killed when struck by a truck driven by an employe of the appellee.

The decedent, at about 4:00, P. M., October, 1934, alighted from a bus which had been proceeding northwardly on Montgomery Road in the City of Norwood, Ohio. The eastern terminus of Mentor Avenue is just opposite the point where the bus stopped. The normal width of the portion of Montgomery Road adapted to the use of vehicular traffic was at the time reduced to twenty-three feet, extending from the west curb. The remaining twenty-seven feet of the highway was impassable due to repairs in process of construction. Due to the narrowing of the traffic lanes, there was a great deal of congestion in the portion of the highway open to vehicular traffic.

The bus stopped at Mentor Avenue, quite close to the eastern side of the open lane. There was only a small space between the bus and the excavated portion of the highway. While a pedestrian could, with considerable difficulty and at some personal risk, have climbed down and over the obstructions caused by the repairs, such course was hazardous and would have taken the decedent in the opposite direction from his destination. Just as the bus upon which decedent had been a passenger came to a stop, another bus proceeding southwardly in the opposite direction, stopped on the north side of Mentor Avenue. This southbound bus was unable to approach the west curb of Montgomery Road owing to the presence of automobiles parked along the west curb, of the road and north of Mentor Avenue.

Behind the northbound bus, from which decedent alighted, were several automobiles, the drivers of which were waiting for the bus to proceed. These automobiles had been driven along closely following the northbound bus for some time, being unable to pass it with safety because of the narrow lane left for north and south bound traffic.

There were no automobiles parked on the west side of Montgomery Road, south of Mentor Avenue. It is apparent that the driver of each bus was waiting for the other to proceed, as the one opposite Mentor Avenue offered the widest space to pass.

The decedent, after alighting from the forward door of the bus, proceeded northwardly along its east side and westwardly in front of it toward the west side of Montgomery Road. As he passed the west front fender of the bus he was struck by the truck driven northwardly by appellee's employe, who apparently decided that this was an opportune time for him to pass the cars standing behind the bus as well as that vehicle. In doing this, it was necessary for the driver to drive his truck upon the west side of Montgomery Road, pass a number of vehicles, and proceed around the northbound bus into his proper path in front of the northbound bus.

There is evidence that the truck did not stop as it came up with the automobiles standing behind the northbound bus, but was driven northwardly past this line of vehicles at a speed of some 35 to 37 miles an hour, and without giving any warning signal of any kind.

There was sufficient evidence to warrant a jury in concluding that the driver was guilty of negligence had the matter been submitted to it. The court based its conclusion to instruct a verdict for the appellee upon the presence of an inference of contributory negligence, arising from the evidence of appellant which remained unrebutted by other evidence in his behalf.

It becomes necessary, therefore, to review with some minuteness the facts developing just what action the decedent took immediately preceding his collision with the truck of appellee.

The driver of the northbound bus in which decedent was a passenger states:

"A. * * * Just as he got to the corner of the bus, this truck, I heard the brakes and, well, it just seemed as though it was to be, they were both there at the same time. He hit this man, the man rolled off a little piece down the street a little farther and he went down the street a little farther and ran into an iron pole." Record, p. 12.

And, again:

"A. Yes sir. Anyhow, the man walked across in front of my bus and as he got to the corner of my bus closest to the curb I heard these brakes, and he just hit the man and went down the street about the distance of a pole, the man rolled off and he ran into another iron pole." Record, pp. 15 and 16.

And:

"Q. What part of his body, or how much of his body, extended beyond this corner that you said, before he was struck?

A. Well, it didn't seem as though—it seemed as though they came together as he stepped from the bus, the machine was there.

Q. So that the truck, would you say, was as close to the bus as the width of a person's body, is that correct?

A. I don't quite understand.

Q. The truck, as it passed this corner of the bus to which this man had been going, how close did the truck go to the bus?

A.

MR. RENDIGS: If you know.

A. I didn't notice how close he was to my bus, but the man no more than stepped from in front of the bus than the machine picked him up.

Q. Did you hear any warning sign of any kind given in the way of a horn?

A. Just the brakes on the machine."

(Record, p. 16).

"Q. From the time you brought your bus to a stop and that man got off, how long was it until he was struck?

* * *

A. I still say it didn't take over four minutes."

(Record, p. 22).

The driver of the southbound bus testified in part:

"A. * * * I sat there and waited for the out-bound bus to come ahead before I proceeded on in Montgomery Road. There were oh, probably four or five machines in back of the bus waiting for him to proceed, and this passenger that got off of the bus proceeded across in front of the bus, and just about the time that he started across in front of the bus I saw this truck pull out from the line of traffic and come on down Montgomery Road, and just as the man stepped from in front of the bus the truck struck him.

* * *

Q. How close did the truck come to the bus as it passed the bus, the north-bound bus?

A. Well, in watching the whole thing I wouldn't judge the distance, but he was very close.

Q. Now, Mr. Chesney, as a truck was going north on Montgomery, did it go in a straight direction or can you tell us how it went?

A. Well, he came down right along the line of traffic there, he was traveling right straight, right along the line of traffic in the rear of the bus, and just as he saw he was going to hit the man, then he swerved to the left.

Q. How far did he travel after he started swerving, if you know?

A. Well, he crashed into a pole there, I would judge about fifteen feet from the corner.

Q. After he crashed into the pole, where did the truck go?

A. The truck sat right up against the pole.

Q. Do you know how far the pole was from the intersection of Mentor and Montgomery Road?

A. I would judge it was about fifteen feet from the corner.

Q. What was the speed of the truck, Mr. Chesney?

A. I would judge the speed was between twenty-seven and thirty-five miles an hour." (Record, pp. 32 and 33).

And, again:

"Q. Tell the jury how he crossed in front of this bus?

A. Well, he got off of the bus and, it wasn't a walk and it wasn't a run, he just sort of jogged along in front of the bus, like he might have been in a hurry to get out of the bus's way and let traffic proceed." (Record, p. 37).

A passenger testified:

"Q. Did his entire body get beyond the line of this bus?

A. No, he was scort of jogging along with his head first, looking north.

Q. What part of his body did the truck hit?

A. His head.

Q. So, as I understand you, his entire body hadn't cleared the bus?

A. Oh, no.

Q. What happened to the bus, or to the truck, pardon me, after that took place?

A. It broke the glass in the windshield; that's where it hit him.

Q. On which side of the truck was the windshield broken?

A. On the right-hand side.

Q. Then where did the truck go?

A. After the man was hurt, after he was thrown about ten feet, probably, I got out first and went and told the storekeeper to telephone for the wagon, a man was seriously hurt." (Record, p. 45).

Whether or not the decedent used the care which a reasonably prudent person is accustomed to use under the same or similar circumstances was a question which should have been submitted to the jury under proper instructions.

Certainly, reasonable minds might differ as to what he should or should not have done.

It is somewhat difficult for this court to even speculate upon what precautions the decedent could have taken in view of the fact that he was struck by the truck before any such precautions could have been of service to him. Had he looked southwardly before passing in front of the northbound bus, along its east side he would have seen nothing, for the truck was then on the west side of Montgomery Road and hidden by the line of automobiles behind the bus. He had no opportunity to look down the west side of the northbound bus, for he was struck as his head passed beyond the front west fender.

The provisions of §6310-36 GC, have no application to the instant facts, even if the evidence affirmatively showed that the decedent had failed to comply with the provisions of the statute which it does not. The presumption, in the absence of affirmative evidence, raises a contrary inference that the decedent used reasonable care for his own safety. 29 O. Jur. §§148, 149, citing Chicago Ornamental Iron Co. v Rook, Admr., 93 Oh St 152, 157. Pittsburgh, Cincinnati & St. Louis Ry. Co., 30 Oh St 480. Martin v Heintz, 126 Oh St 227. The syllabus of the case of Martin v Heintz states:

"1. There is no presumption of negligence, except such as arises from facts proven. There is a presumption of freedom from negligence, and such presumption stands until rebutted by evidence.

"2. An inference of the non-existence of a fact or condition does not arise against a party having no burden of proving same, from the mere absence of evidence relative to such fact or condition.

"3. Upon a motion for a directed verdict the evidence must be given an interpretation most favorable to the plaintiff, and a directed verdict should be refused if a reasonable inference of due care may be drawn from the evidence adduced."

. We conclude that the court erred in instructing the verdict for appellee.

The judgment is reversed and the cause remanded for a new trial.

HAMILTON and MATTHEWS, JJ, concur.